The following constitutes the
Memorandum Decision of the Court.
Signed November 19, 2015

Roger L. Efremsky
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

In re:

MORTGAGE FUND '08 LLC,

     Debtor.

_____/

SUSAN L. UECKER,
Trustee of the Mortgage
Fund'08 Liquidating Trust,

     Plaintiff,

v.

ROBERT L. MONTGOMERY,

     Defendant.

_____/

Case No. 11-49803 RLE

Chapter 11

Adv. Proc. No. 13-4190 RLE

**MEMORANDUM DECISION RE MOTIONS
FOR SUMMARY JUDGMENT**

-1-

## I. Introduction

Before the court are cross-motions for summary judgment by plaintiff Susan L. Uecker, the liquidating trustee appointed under the confirmed plan of Mortgage Fund '08 LLC (the "Trustee" and "MF08"), and defendant Robert L. Montgomery. This matter has been fully briefed and argued.

The Trustee moves for summary judgment on the California Civil Code §3439.04(a) constructive fraudulent transfer claim in her first amended complaint. Montgomery moves for summary judgment on the affirmative defenses asserted in his answer.

For the reasons explained below, the court grants summary adjudication for Montgomery on his affirmative defense regarding the effect of a release in a settlement agreement which effectively moots the remaining summary judgment issues.

## II. Background

These motions require a review of certain events in MF08's chapter 11 case and the chapter 11 case of its affiliate, RE Loans, LLC, which was filed in the Northern District of Texas (Case no. 11-35865-BJH) ("REL").

The following facts are taken from the First Amended Complaint (the "FAC") (Docket no. 30); Montgomery's Answer to the FAC (Docket no. 31); the Trustee's Declaration and Statement of Undisputed Facts (Docket nos. 44-2 and 44-5); Montgomery's Declaration and Statement of Undisputed Facts (Docket nos. 46-1 and 46-2); and Montgomery's Request for Judicial Notice (Docket no. 48).

For context, the court also takes judicial notice of MF08's Plan and Disclosure Statement (MF08 Docket nos. 101-102); REL's Disclosure Statement (REL Docket no. 843); REL's Plan (REL Docket no. 905); the Declaration of James A. Weissenborn in Support of Confirmation of the REL Plan (REL Docket no. 943); and the Findings of Fact, Conclusions of Law, and Order Confirming the REL Plan (the "REL Confirmation Order") (REL Docket no. 967). Harris v. Cnty of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) (court may take judicial notice of undisputed matters of public

-2-

record including documents on file in federal courts).

**A. The Bankruptcy Cases**

MF08's bankruptcy case was commenced as an involuntary chapter 7 on September 12, 2011. MF08 Docket no. 1. The case was converted to chapter 11 and an order for relief was entered on September 28, 2011. MF08 Docket no. 11. The order approving its Disclosure Statement and confirming its Plan was entered on February 3, 2012 and the Trustee has been in place since that time. MF08 Docket nos. 144-145.

REL commenced its chapter 11 case in the Northern District of Texas on September 13, 2011. REL Docket no. 1. The REL Confirmation Order was entered on June 26, 2012. As will be explained below, MF08 filed a claim in the REL case which is the genesis for these motions.

**B. Ownership and Operation of MF08 and REL**

Walter Ng and his sons Kelly Ng and Barney Ng owned, managed, and controlled, directly or indirectly, MF08 and REL and their related entities, B-4 Partners, LLC and Bar-K. Docket no. 30, FAC ¶8-10; Docket no. 31, Answer ¶8-10; Docket no. 44-5, Uecker Decl. Ex. 5 (MF08's proof of claim filed in REL's case (the "Proof of Claim"); REL Docket no. 843 (Disclosure Statement). The FAC alleges that Walter and Kelly Ng formed REL in January 2002.[1] REL made secured loans to real estate developers. To raise money to fund these loans, it sold unregistered securities to investors who became members of REL. By the end of 2006, REL had raised over $700 million, had over

---

[1] The REL Disclosure Statement explains that REL was the successor entity resulting from the merger of nine limited partnerships into a limited liability company. B-4 Partners was REL's sole manager from 2002 to REL's ch. 11 filing in 2011 and REL's sole member from November 2007. From 2009, Walter, Kelly, and Barney Ng were the members of B-4 Partners. Walter Ng was a manager of B-4 Partners until he resigned when his bankruptcy case was filed in May 2011. REL Docket no. 843, Disclosure Statement at 18.

-3-

1,400 members and reported more than $55 million cash on hand. Docket no. 30, FAC ¶12; Docket no. 31, Answer ¶12; Docket no. 44-10, Sugarman Report. <u>See also</u>, REL Disclosure Statement (REL Docket no. 843); Declaration of James A. Weissenborn in support of confirmation of REL Plan (REL Docket no. 943).

In early 2007, REL faced liquidity problems. It had been advised by its attorneys that it could not raise more money from new investors which meant it would then be unable to meet the withdrawal demands of its old investors and meet its funding commitments to its borrowers. Docket no. 30, FAC ¶13-14; Docket no. 44-10, Sugarman Report at 3-5.

In November 2007, REL made its members into noteholders in what is referred to as the "Exchange Transaction" and the issuance of "Exchange Notes." REL Docket no. 843, Disclosure Statement at 21-22. When it filed its bankruptcy case in September 2011, REL had approximately 2,900 noteholders who were owed approximately $646 million (the "REL Noteholders"). REL Docket no. 843, Disclosure Statement at 22-23. Montgomery is an REL Noteholder.

In December 2007, the managers of REL created MF08. Docket no. 30, FAC ¶16; Docket no. 44-10, Sugarman Report at 1. The Mortgage Fund, LLC ("TMF") was MF08's sole member and manager; Walter Ng and Kelly Ng were the sole members of TMF and thus controlled MF08. Docket no. 30, FAC ¶8-10; Docket no. 31, Answer ¶8-10. REL, MF08, TMF, B-4 Partners, and Bar-K all did business from the same address in Lafayette, California. Docket no. 30, FAC ¶9; Docket no. 31, Answer ¶9.

MF08's stated purpose was to make secured loans to real estate developers. Docket no. 30, FAC ¶16; Docket no. 44-10, Sugarman Report at 1. MF08 did business much as REL did after the Exchange Transaction. As of its petition date, MF08 had approximately 572 noteholders who were owed approximately $80 million and held a real estate portfolio valued at approximately $72 million. MF08 Docket no. 101, Disclosure Statement at 1-8.

### C. MF08's $66 Million Proof of Claim in the REL Case

The Trustee's declaration states that "[p]rior to my

-4-

appointment as trustee, MF08 asserted that MF08 transferred $66,226,496 to REL and that REL was liable to MF08 in this amount. I continued to assert this claim after my appointment." Docket no. 44-5, Uecker Dec. ¶13-14, Ex. 5 (Proof of Claim). The Proof of Claim describes the MF08 ownership structure as noted above. It asserts:

> [B]etween December 4, 2007, and February 4, 2009, *the Ngs caused* the aggregate sum of $66,226,496 to be transferred from MF08's bank accounts to [REL] (the "Cash Transfers"). The Cash Transfers were made either (1) directly to [REL], (2) *indirectly through [TMF] or Bar-K*, or (3) to [REL's] borrowers to enable such borrowers to service or repay loans extended to them by [REL].

Docket no. 44-5, Uecker Dec. Ex. 5 (emphasis added).

The Proof of Claim seeks the recovery of the Cash Transfers based on the theory that MF08 made them with the actual intent to hinder, delay or defraud entities to whom MF08 was or became indebted. It includes a list of each of the Cash Transfers that totals $66,226,496.

**D. MF08 Settlement with REL and Confirmation of the REL Plan**

REL informally objected to MF08's Proof of Claim. Docket no. 44-5, Uecker Dec. ¶14. In April 2012, the principal stakeholders in the REL case - REL, Wells Fargo Capital Finance (REL's secured lender), and the official REL Noteholders' Committee (representing Montgomery's interests as a REL Noteholder) - participated in a judicial mediation. They then reached a settlement of the outstanding issues regarding the validity and priority of MF08's Proof of Claim, along with related issues which allowed REL to proceed to confirmation of its Plan. Docket no. 44-5, Uecker Dec. ¶14-15.[2]

REL filed a motion to obtain court approval of the settlement. Docket no. 48, RJN Ex. 10 (Motion for Approval of Settlement, REL Docket no. 907 (the "Motion"). Attached to the Motion is an unsigned copy of the settlement agreement between

---

[2] The REL plan confirmation process was underway in April 2012; the first version of its plan and disclosure statement were filed February 1, 2012. REL Docket nos. 465-466.

-5-

REL and MF08 (the "Settlement Agreement"). Docket no. 48, RJN Ex. 9 (Settlement Agreement), REL Docket no. 907-1 (Settlement Agreement).

The Motion describes the Proof of Claim and MF08's fraudulent transfer theory. The Motion defines the "REL Transfers" as the transfer of $66 million made between December 2007 and "approximately August of 2008"[3] and the commingling by REL in its general account with other REL funds. Docket no. 48, RJN Ex. 10 (Motion ¶12-13). MF08 contended that "if it can trace the funds that it transferred to REL from REL to any given [REL] Noteholder, MF08 might have the right to pursue recovery from that [REL] Noteholder as a subsequent transferee pursuant to Bankruptcy Code §550(b)." These are defined as the "MF08 Potential Avoidance Actions." Docket no. 48, RJN Ex. 10 (Motion ¶14). The Motion then describes the response by REL and the REL Noteholders Committee:

> [REL] and the Noteholders Committee contend that Noteholders who received the REL Transfers who were *not insiders* of [REL] cannot be liable to MF08 because (a) it is not possible to trace the dollars received from MF08 to any specific REL Transfer or transferee; and (b) each [REL] Noteholder that received an REL Transfer, with the *possible exception of insiders* of [REL], received any such REL Transfer on account of a debt payable by [REL] for value, in good faith, and without knowledge of the voidability of the transfer from MF08 to [REL] (even assuming that transfer is avoidable) and, therefore, would be shielded from liability pursuant to Bankruptcy Code §550(b).

Docket no. 48, RJN Ex. 10 (Motion ¶15) (emphasis added).

The Motion then describes the "prior plan compromise" which had been negotiated by REL and the REL Noteholders' Committee and

---

[3] The court notes that in the Proof of Claim, the time period for the transfer of $66 million is December 4, 2007 to February 4, 2009 - not August 2008. Also, §2.01 of the Settlement Agreement says the $66 million was transferred from "December 2007 through 2008" and §2.04 defines the REL Transfers as having been made "between December 2007 through approximately August 2008." The FAC says the time period for the transfer to Montgomery is July 22, 2008 to October 8, 2008. There is no explanation for these differing dates. It is unclear if there is any significance to these differences.

-6-

the change to it which was now required by this proposed settlement with MF08. Docket no. 48, RJN Ex. 10 (Motion ¶16). Essentially, the prior plan compromise provided that if the REL Noteholders voted to accept the plan, the REL Noteholders' lien on REL assets would be released, they would share pro rata with holders of general unsecured claims and their claims would not be "subordinated or challenged," but each REL Noteholder's claim would be reduced by 50% of any cash received after the November 2007 Exchange Transaction through the REL petition date. Docket no. 48, RJN Ex. 10 (Motion ¶16).

The proposed deal with MF08 made one change to the "prior plan compromise." Instead of the REL Noteholders sharing pro rata with the general unsecured creditors, the first $5 million to be distributed was to go to general unsecured creditors before the REL Noteholders would share pro rata. This change increased the distribution to general unsecured creditors - primarily benefitting MF08 as the largest such creditor - and reduced the distribution to REL Noteholders through reallocation of the first $5 million. In exchange for this "enhancement," MF08 agreed to vote its $66 million claim in favor of the plan.[4] Docket no. 48, RJN Ex. 10 (Motion ¶17). In addition, the Motion states that in exchange, MF08 would waive the right to pursue all MF08 Potential Avoidance Actions against REL Noteholders, and MF08 would be appointed to the trust oversight committee of the liquidating trust to be created under the REL Plan. Docket no. 48, RJN Ex. 10 (Motion ¶3 (summarizing terms of agreement resolving objection to MF08's Proof of Claim and the relative treatment of all unsecured claims and the REL Noteholder claims)).

The Motion explained that absent this agreement, the parties would be forced to litigate the merits of the MF08 Proof of Claim, the merits of the final plan compromise, the relative priorities and rights as between the holders of general unsecured claims and the REL Noteholders, and the merits of the MF08

_____

[4] The REL Confirmation Order describes MF08 as REL's largest unsecured creditor. REL Docket no. 967, REL Confirmation Order ¶M.

-7-

Potential Avoidance Actions. This was an unattractive proposition because it would "consume substantial cash that would otherwise be distributable to REL Noteholders and MF08's creditors." Docket no. 48, RJN Ex. 10 (Motion ¶23-25).

The Motion also noted that many REL Noteholders were also investors in MF08, and paying the professionals to redistribute the limited funds available as between MF08 and REL would reduce the total amount received by all creditors. Litigating MF08's Potential Avoidance Actions would also likely be complex and could require expensive efforts to trace funds, and every dollar spent on professionals would reduce the amount available for distribution to creditors. The modified plan eliminated these issues and was supported by all stakeholders, including the committee of MF08's noteholders. Docket no. 48, RJN Ex. 10 (Motion ¶23-25).

On June 18, 2012, the REL bankruptcy court held a hearing on the Motion and granted it. Docket no. 48, RJN Ex. 11 (Order on Motion). As a result, MF08 obtained allowance of its $66 million claim, the $5 million preferred payment, and a position on the REL trust oversight committee.[5] The REL Noteholders agreed to reduce the allowed amount of their claims by 50% of what they had been paid between the November 2007 Exchange Transaction and REL's September 2011 petition date in exchange for a release from potential fraudulent transfer actions. With the REL Noteholders' and MF08's support, REL obtained a clear path to confirmation of its Plan.

**E. The Settlement Agreement**

The Settlement Agreement is an exhibit to the Motion. Of particular concern for these summary judgment motions are the following sections. The recitals in §2 of the Settlement Agreement provide:

---

[5] According to the Trustee's Third Quarter 2015 Operating Report, the MF08 estate has been paid $1.591 million by the REL estate as of April 2015. MF08 Docket no. 824 (Operating Report).

-8-

2.01 MF08 transferred cash in an amount equal to $66,226,496 to [REL] during the period from December of 2007 and through 2008.

2.02 MF08 contends that [REL] is liable to MF08 for the monies received on various theories, including without limitation based upon the contention that the transfers may have constituted fraudulent transfers.

2.03 During the time period from December of 2007 through approximately August of 2008, [REL] received cash and deposited that cash into its general account from multiple sources, including without limitation (a) the transfers from MF08 described in 2.01, above, (b) payoffs by [REL's] borrowers of principal and interest, (c) sales of assets, and (d) advances by Wells Fargo Capital Finance, LLC ("Wells Fargo").

2.04 During the time period from December of 2007 through approximately August of 2008, [REL] made payments out of its general account to many different parties, including without limitation, payments to various creditors, including without limitation the holders of Exchange Notes issued to [REL's] Noteholders (the "REL Transfers").

2.05 MF08 contends that if it could trace the funds that it transferred to [REL] as described in Paragraph 2.01 from [REL] to the holders of Exchange Notes, MF08 might have the right to pursue recovery from the holders of Exchange Notes as "subsequent transferees" pursuant to Bankruptcy Code § 550(d) [sic]. [REL] contends that holders of Exchange Notes who received the REL Transfers cannot be liable to MF08 because (a) it is not possible to trace the dollars received from MF08 to any specific REL Transfer; and (b) each holder of an Exchange Note that received an REL Transfer, with the possible exception of insiders who may have received an REL Transfer, received any such REL Transfer on account of a debt payable by [REL] for value, in good faith, and without knowledge of the voidability of the transfer from MF08 to [REL] (even assuming the transfer is avoidable) and, therefore, would be shielded from liability pursuant to Bankruptcy Code §550(b).

2.06 MF08's potential right to assert claims against holders of Exchange Notes that received REL Transfers shall be referred to herein as "MF08's Potential Avoidance Actions".

Sections 3.01 – 3.03 dealt with the allowance of MF08's claim in the REL case. In short, if REL's Plan was confirmed and

-9-

the plan compromise was approved, MF08's Proof of Claim "shall be allowed" in the amount of $66,226,496. Sections 4.01 – 4.02 dealt with waiver of the right to pursue MF08 Potential Avoidance Actions:

> 4.01 If the MF08 Claim is Allowed pursuant to Paragraph 3 above, MF08 waives the right to pursue any MF08 Potential Avoidance Actions; provided, however, that this Agreement shall not limit or restrict the right of MF08 to bring any action against any third party, including any manager, member, insider or professional of MF08. This provision shall be void and of no further force or effect if the MF08 Claim is not Allowed pursuant to Paragraph 3, above.

> 4.02 With respect to the claims released herein, MF08 acknowledges that it has been advised by its attorneys concerning, and is familiar with, the California Civil Code Section 1542 and it expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect with respect to the claims released herein. Section 1542 of the California Civil Code provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Docket no. 48, RJN Ex. 9-10 (Motion and Settlement Agreement) (emphasis in original).

### F. The Transfer to Montgomery

The Trustee declares that shortly after she was appointed as Trustee in February 2012, she was provided all the books and records maintained by MF08, including the bank statements and general ledgers for both MF08 and TMF.[6] Docket no. 44-5, Uecker

---

[6] Upon MF08's filing in September 2011, the Ngs were removed and new management and their professionals "thoroughly reviewed MF08's books and records with a view to tracing all transfers of cash made by MF08 during the history of its existence." MF08 Docket no. 101, Disclosure Statement at 5. The court assumes this analysis was shared with the Trustee upon her appointment in February 2012 and that she possessed this information at the time she participated in the mediation in April 2012.

-10-

Dec. ¶3.

Between approximately July 22, 2008 and October 8, 2008, the managers of REL made a series of transfers from MF08 to TMF and these funds were used to pay REL investors to keep the REL "Ponzi scheme" going. Docket no. 30, FAC ¶16-17. The transfer to Montgomery is allegedly one of these transfers. Docket no. 30, FAC ¶18.[7] The FAC alleges that MF08 was insolvent at the time these transfers were made and they were made with actual or constructively fraudulent intent and no value was given in exchange. Docket no. 30, FAC ¶17-21. (The Trustee's expert also states that MF08 was insolvent from its inception onwards. Docket no. 44-7, Sugarman Dec. ¶11. Montgomery does not dispute that MF08 was insolvent.)

Montgomery had $924,887 invested in REL as of December 31, 2007. Docket no. 46-2, Montgomery Dec. ¶4, Ex. 1, Ex. 5. On July 1, 2008, at Montgomery's request, REL transferred $150,000 to Montgomery. On July 31, 2008, an additional $150,000 was transferred to Montgomery. These transfers went directly to Montgomery's Individual Retirement Account at Wells Fargo Bank. Docket no. 31, Answer Ex. B (9/30/08 REL investor portfolio account statement - each $150,000 transfer described as "sold shares" in REL); Docket no. 46-2, Montgomery Dec. Ex. 1 (3/18/10 REL investor portfolio account statement - each transfer described as "note prepay"); Docket no. 46-2, Montgomery Dec. Ex. 3 (1/1/08-12/31/08 Wells Fargo Bank IRA statement - each transfer described as "liquidation RE Loans").[8] The Trustee seeks to recover this second $150,000 transfer because it was made by a check written on TMF's bank account.

In support of her motion, the Trustee offers the July 2008 bank statements for MF08 and TMF. Docket no. 44-5, Uecker Dec. Ex. 1-2. In support of his motion and in opposition to the

---

[7] In September 2013, the Trustee commenced 16 other adversary proceedings against REL Noteholders with the same basic allegations as made in this case. Eight of these are still pending.

[8] There is no explanation for this varying terminology.

-11-

Trustee's, Montgomery offers REL's July 2008 bank statement. Docket no. 48, RJN, Ex. 12.[9]

The bank documents offered by both the Trustee and Montgomery show the following sequence of events:

1. On July 21, 2008, REL transferred $528,791 to MF08. Docket no. 48, RJN Ex. 12 at 2 of 6 (REL bank statement); Docket no. 44-6, Uecker Dec. Ex. 1 at 1 of 3 (MF08 bank statement).

2. On July 21, 2008, MF08 transferred $528,791 to TMF. Docket no. 44-6, Uecker Dec. Ex. 1 at 2 of 3 (MF08 bank statement), Ex. 2 at 1 of 2 (TMF bank statement).

3. On July 23, 2008, TMF wrote check no. 1020 for $150,000 made payable to "WFB IRA Services fbo Montgomery." Docket no. 44-6, Uecker Dec. Ex. 3 ($150,000 check).

4. On July 25, 2008, REL transferred $447,566 to MF08. Docket no. 48, RJN Ex. 12 at 5 of 6 (REL bank statement), Docket no. 44-6, Uecker Dec. Ex. 1 at 2 of 3 (MF08 bank statement).

5. On July 28, 2008, MF08 transferred $447,566 to TMF. Docket no. 44-6, Uecker Dec. Ex. 1 at 2 of 3 (MF08 bank statement)  Ex. 2 at 1 of 2 (TMF bank statement).

6. On July 28, 2008, TMF's bank honored the $150,000 check to Montgomery. Docket no. 44-6, Uecker Dec. Ex. 2 at 2 of 2 (TMF bank statement). Montgomery's IRA statement shows it had received this $150,000 as of July 31, 2008. Docket no. 46-2, Montgomery Dec. Ex. 3.

The Trustee points out that the only deposit into the TMF account between July 1 and July 23, 2008 was the $528,791 deposit and it raised the balance in this account to $571,022. However, the July 2008 TMF bank statement also shows that $447,566 was deposited on July 28, 2008. The TMF bank statement also shows there were only two withdrawals from the TMF account between July 21 and July 28 – the $150,000 check to Montgomery and a $400,000

_____

[9] The Trustee has objected to the admission of the REL bank statement on the grounds it is hearsay. The Trustee is correct. However, the Trustee appears to waive this objection by responding that the payments shown on this bank statement are shown on MF08's records as payments by REL of accrued interest to MF08. Docket no. 52-1, Uecker Dec. ¶7-8.

-12-

wire transfer to another REL Noteholder who has settled his fraudulent transfer case brought by the Trustee.

The Trustee says MF08's books and records do not show that MF08's transfer of $528,791 to TMF was in payment of a debt owed by MF08 to TMF and do not show that MF08 received anything from TMF in exchange for this transfer. She also states that TMF's records do not reflect that the transfer was in payment of a debt owed by MF08 to TMF or that TMF transferred any assets or property to MF08 in exchange for the funds. Docket no. 44-5, Uecker Dec. ¶9. Montgomery does not challenge this.

It is undisputed that in July 2008, REL transferred $528,791 to MF08 and then transferred $447,566 to MF08 and MF08 immediately transferred these exact amounts to TMF.[10] It is also undisputed that when sufficient funds were in the TMF account, TMF's bank honored the check to Montgomery and it was credited to his IRA on July 31, 2008.

The Trustee states that the $66 million in the Proof of Claim does not include the amounts that MF08 transferred to TMF which were then used to pay REL Noteholders such as Montgomery. Docket no. 44-5, Uecker Dec. ¶13-14. The only support for this assertion is the Trustee's own statement.[11] The time period for the Cash Transfers includes the date of the transfer to Montgomery. At a minimum, and without more support, this suggests that some of the funds transferred from MF08 to REL may

---

[10] The Trustee contends that the transfers of $528,791 and $447,566 were for "payment of accrued interest" on two loans sold by REL to MF08 in April 2008 but with the sales made effective as of December 2007. Docket no. 52-1, Uecker Dec., ¶6-9. However, according to the Trustee's expert, "[a]s of March 2008, the borrowers on these loans had stopped paying interest and loans were in default." Docket no. 44-7, Sugarman Dec., ¶9-10. The T&J Saucepan loan was in default at the time of transfer to MF08; the Peachtree loan was delinquent 30 days as of June 30, 2008. Docket no. 44-10, Sugarman Report at 12-14. Thus, it is unclear if interest payments were in fact made by REL's borrowers or if these payments were fictional.

[11] At oral argument Trustee's counsel stated there was a basis for the assertion but did not specify what it was.

-13-

eventually have made their way to him and this $150,000 transfer may be included in the total in the Proof of Claim.

**III. Discussion**

    **A. Summary Judgment Standard**

    A court should grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a), applicable here by Fed.R.Bankr.P. 7056. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-78 (1986). Material facts are those that may affect the outcome of the case. <u>Anderson</u>, at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. <u>Id</u>. at 248-49.

    A party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions or affidavits that demonstrate the absence of a triable issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To meet its burden, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. <u>Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Companies, Inc.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).

    If the moving party meets its initial burden, the burden shifts to the non-moving party, which must go beyond the pleadings and submit admissible evidence supporting its claims or defenses and showing a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324; <u>Nissan Fire</u>, 210 F.3d at 1103. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. <u>Celotex</u>, 477 U.S. at 323.

    In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable

-14-

to the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Montgomery has the burden of proving he is entitled to summary judgment on his affirmative defenses regarding the Settlement Agreement. Fed.R.Civ.P. 56(a). A court may grant summary judgment regarding the interpretation of ambiguous language in a contract if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language. <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 232 F.3d 153 (2nd Cir. 2000).

The Trustee has the burden of proof on the elements of her fraudulent transfer claim. To avoid summary judgment in her favor, Montgomery must identify specific triable facts. <u>Southern California Gas Co. v. City of Santa Ana</u>, 336 F.3d 885 (9th Cir. 2003).

**B. The Trustee's Summary Judgment Argument**

The Trustee argues that she has shown that MF08 is entitled to summary judgment on its Civil Code §3439.04(a)(2)(A) constructive fraudulent transfer claim (applicable here pursuant to Bankruptcy Code §544(b)).[12]

She asserts that the undisputed facts show MF08 is entitled to avoid the transfer of $528,791 from MF08 to TMF and may recover $150,000 of it from Montgomery as either the initial transferee or the immediate transferee of the initial transferee as Bankruptcy Code §550(a) permits. Docket no. 44, Memorandum at 10-11. She acknowledges that TMF may not have had dominion over the funds because TMF, MF08, and REL were all controlled by Walter and Kelly Ng which would make Montgomery the initial transferee rather than a subsequent transferee. However, she

---

[12] She also argues she has shown she is entitled to summary judgment on a Civil Code §3439.05 claim but there is no such claim pled in the FAC.

-15-

claims this does not change the outcome.[13]

The Trustee also argues that she has shown she is entitled to summary judgment disposing of Montgomery's affirmative defense under Bankruptcy Code §550(b) because there is no evidence that he gave value to TMF or MF08[14] and his interpretation of the Settlement Agreement is simply incorrect. Docket no. 44, Memorandum at 12-17.

In opposition to the Trustee's motion, Montgomery argues that he is, in fact, the recipient of a REL Transfer based on the series of transfers that ended with the TMF check to his IRA. Under that theory, he argues that the Settlement Agreement covers this transfer to him. He also contends that MF08's waiver of the protections of Civil Code §1542 in the Settlement Agreement also protects him. Relying on In re California Litfunding, 360 B.R. 310 (Bankr. C.D. Cal. 2007), Montgomery also contends that the Trustee's lawsuit is an impermissible collateral attack on the REL Confirmation Order. Docket no. 54, Memorandum.

In reply, the Trustee argues that Montgomery has not offered any evidence to defeat entry of summary judgment on her fraudulent transfer case. He has presented no evidence showing that MF08 did not have dominion over the funds that may have been transferred to it by REL. Whether REL was the source of the funds does not matter because there is no evidence that MF08's right to use the funds was restricted in any way. Adams v. Anderson (In re Superior Stamp & Coin Co.), 223 F.3d 1004, 1009 (9th Cir. 2000)

---

[13] Civil Code §3439.01(a)(asset means property of debtor) and (h) (property means anything that may be subject of ownership); Bankruptcy Code §548(a)(1) (a trustee may avoid a transfer of an interest of the debtor in property); In re Bullion Reserve of North America, 944 F.2d 544, 548 (9th Cir. 1991) (discussing requirement of dominion over money for transferee status); In re Incomnet, Inc., 463 F.3d. 1064 (9th Cir. 2006) (discussing definition of transferee).

[14] Because her claim is based on Civil Code §3439.04 and §3439.07, the defenses under Civil Code §3439.08 are also relevant. In re JTS Corporation (Decker v. Tramiel), 617 F.3d 1102 (9th Cir. 2010).

-16-

(discussing earmarking doctrine for preference analysis, where bank advanced funds to debtor on condition they be used for paying a specific creditor, debtor did not have control over the funds, earmarking defense applied). As to the release issue, she argues that Montgomery ignores the plain language of the Settlement Agreement and offers no evidence on which the trier of fact could find that the Settlement Agreement was intended to release this claim. Docket no. 60, Reply Memorandum.

### C. Montgomery's Summary Judgment Argument

Montgomery moves for summary judgment on his affirmative defenses. He makes the same arguments made in opposition to the Trustee's motion, i.e., that the Settlement Agreement covers this claim against him, that he is a good faith transferee for value, and that the evidence shows he was in fact the recipient of a REL Transfer. Docket no. 49, Memorandum.

In opposition to Montgomery's motion, the Trustee argues Montgomery has offered no evidence to defeat her entitlement to summary judgment on her fraudulent transfer case and repeats the arguments about the interpretation of the Settlement Agreement. Docket no. 52, Opposition Memorandum.[15]

In reply, Montgomery argues it defies credulity for the Trustee to argue she was unaware of the transfers from MF08 to TMF because she had all relevant records at the time she signed the Settlement Agreement. The waiver of the protections of Civil Code §1542 prevent her from suing him. Docket no. 61, Reply Memorandum.

### D. Discussion of the Release Issues

The essential question raised by Montgomery's motion for summary judgment on his affirmative defense regarding the Settlement Agreement is whether the Settlement Agreement between

---

[15] The Trustee also objects to many of the so-called undisputed facts in Montgomery's motion. Docket no. 52-3, Statement of Disputed Facts in Opposition. The Trustee is largely correct.

-17-

REL and MF08 released this fraudulent transfer claim against him. Was he released as a subsequent transferee because he was paid by REL using untraceable MF08 money, or was he excluded from this released class because he was paid by TMF, MF08's owner and manager, with funds traceable to, or originating with and under the dominion of, MF08? Was Montgomery released because MF08 waived the right to pursue unknown or unsuspected claims that it had at the time the Settlement Agreement was signed? Or is he a third party the Trustee reserved the right to sue?

The Trustee argues that the Settlement Agreement released only a narrow class of claims - claims against REL Noteholders who were paid by REL - and §4.01 preserves MF08's right to bring this action against Montgomery as "any third party." The Trustee also insists that the language of the Settlement Agreement does not support a finding that the intent of the parties was to release unknown claims. Docket no. 44, Trustee's Memorandum at 17. On the other hand, Montgomery argues that the language of the Settlement Agreement clearly supports his position that the intent was to release this action against him. He relies on the language in the Settlement Agreement, and on the communications he received from the Noteholders Committee urging a vote in favor of the REL Plan. Docket no. 54, Montgomery's Memorandum at 9; Docket no. 46-2, Montgomery Dec. Ex. 8 (Committee's letter explaining REL Plan).[16] Thus, they clearly disagree as to the Settlement Agreement's meaning, suggesting, at the very least, that it *may be* ambiguous.

---

[16] The Trustee argues that the court should ignore the REL Noteholders' Committee's letter because it is the uncommunicated subjective intent of the Committee which is irrelevant in this context. Docket no. 52, Opposition at 22. The letter, in substantially the same form, was approved by the REL court to be delivered to the REL Noteholders with the ballot for voting on the REL Plan. REL Docket no. 832 (proposed solicitation letter). It was obviously communicated to the REL Noteholders. The REL Noteholders' Committee's counsel's task was to explain the consequences of voting for or against confirmation. It is of limited utility here and the court merely notes the inaccuracy of the Trustee's characterization of it as "uncommunicated."

-18-

### 1. Is the Settlement Agreement Ambiguous?

If the Settlement Agreement is reasonably susceptible to more than one interpretation, it is ambiguous. <u>Winet v. Price</u>, 4 Cal.App.4th 1159, 1165-66 (1992). To determine whether it is ambiguous, the court provisionally accepts extrinsic evidence regarding competing interpretations of the Agreement. <u>Pacific Gas & E. Co. v. G.W. Thomas Drayage & etc. Co.</u>, 69 Cal.2d 33, 39-40 (1968) (rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties).

Montgomery requests that the court take judicial notice of certain documents that are, in context, extrinsic evidence. As explained in <u>Winet v. Price</u>:

> The decision to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step-interpreting the contract.

<u>Winet v. Price</u>, 4 Cal.App.4th 1159, 1166 (1992).

This threshold question regarding ambiguity is answered in the affirmative by a review of the language of the Settlement Agreement, a review of the extrinsic evidence offered by Montgomery, and the language of the Proof of Claim itself.

Referring to the defined terms in §2.01 - 2.05 of the Settlement Agreement, the Trustee argues that MF08 released only its claims against REL Noteholders for recovery of amounts *paid by REL* and these are the MF08 Potential Avoidance Actions MF08 agreed to release. The Trustee also contends that the language in §4.01 reserving the right to pursue "any action against any third party, including any manager, member, insider or professional of MF08" means that she may pursue Montgomery as he is "any third party." She claims no extrinsic evidence is required to see the intent of the parties and none has been provided by Montgomery contradicting her interpretation.

-19-

Referring to the undisputed fact that individuals Walter and Kelly Ng owned, controlled and managed REL, MF08 and TMF, Montgomery argues that the *paid by REL* terminology is a meaningless distinction in the context in which this settlement was reached and the release was intended to cover this transfer to him. He offers in support: (1) his REL investor portfolio account statement in which REL takes credit for the $150,000 payment TMF ostensibly made to him; (2) the REL Noteholders' Committee's letter to the REL Noteholders; (3) the findings of fact and conclusions of law in support of the REL Confirmation Order; and (4) his Wells Fargo Bank IRA statement indicating payments had come from REL. In addition, the court notes that language in MF08's Proof of Claim shows that MF08 was aware that TMF was used to make the allegedly fraudulent transfers at the behest of the Ngs who controlled all of the related entities. Docket no. 44-5, Uecker Dec., Ex. 5, (Proof of Claim ¶3 (the "Ngs caused the transfer" of $66 million, the transfers were made "either directly to REL, indirectly through TMF or Bar-K, or [directly] to REL's borrowers")).

The court has provisionally admitted this evidence and reviewed it. The court concludes that the language of the Settlement Agreement is reasonably susceptible to the competing interpretations offered by the parties and it is therefore ambiguous.

### 2. The Extrinsic Evidence

Having found that the Settlement Agreement is ambiguous, the court can admit all credible extrinsic evidence to construe it. Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co., 69 Cal.2d 33, 37 (1968). Such evidence includes the circumstances surrounding the making of the Agreement, including its object, nature, and subject matter. The court takes judicial notice of the extrinsic evidence requested by Montgomery.

If the extrinsic evidence is not in conflict, the resolution of the ambiguity is a question of law. Wolf. v. Superior Court, 114 Cal.App.4th 1343, 1351 (2004); Scheenstra v. California Dairies, Inc., 213 Cal.App.4th 370, 390 (2013) (even where

-20-

uncontroverted evidence allows for conflicting inferences to be drawn, interpretation of contract solely a judicial function). Here, the extrinsic evidence is not in conflict.

### *3. Interpretation of the Settlement Agreement*

Section 8.07 of the Settlement Agreement provides that it is to be governed by California law. Under California law, the court interprets the Settlement Agreement using the same principles applicable to the interpretation of any other contract. The goal is to interpret it to give effect to the mutual intent of the parties as it existed when they contracted.[17] Civil Code §1636 (contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful), Pacific Gas & E. Co., 69 Cal.2d at 38. It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce. Winet, 4 Cal.App.4th at 1165.

A release is the abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced. Civil Code §1541 (an obligation is extinguished by a release therefrom given to the debtor by the creditor); Marder v. Lopez, 450 F.3d 445 (9th Cir. 2006). In general, a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence. Marder, 450 F.3d at 449.

### *4. "REL Transfer" and "Paid by REL"*

The Trustee argues that the Settlement Agreement defines a

---

[17] The Trustee argues that Montgomery has no extrinsic evidence that the parties to the Settlement Agreement intended to release any REL Noteholder who was not "paid by REL." In any argument about the intent of the parties, Montgomery is at a distinct disadvantage. As a REL Noteholder, counsel to the REL Noteholders' Committee represented him in the negotiations and he is an intended beneficiary of the settlement.

-21-

narrow category of claims in §§2.04 - 2.06 which were released: the MF08 Potential Avoidance Actions against REL Noteholders who were paid by REL with the $66 million transferred from MF08. It is undisputed that the check Montgomery received was written by TMF from its bank account. Based on this fact alone, the Trustee claims Montgomery was not paid by REL so he is not among the class of REL Noteholders covered by the release in the Settlement Agreement.

Montgomery's interpretation of "REL Transfer" and "paid by REL" in the Settlement Agreement relies, in part, on his extrinsic evidence regarding the context in which the Settlement Agreement was reached.

The extrinsic evidence is consistent on one essential point. By everything he was told by REL, it is reasonable to interpret the Settlement Agreement as Montgomery does. By all appearances, he *had* been paid by REL and had received a REL Transfer: (1) he was paid in the time period described in the Proof of Claim (i.e., December 2007 - February 2009), and in the time period in §2.04 of the Settlement Agreement (i.e., December 2007 - August 2008); and (2) his investor portfolio account statement showed REL took credit for making the $150,000 payment when it was made.

The REL Noteholders' Committee's communications to Montgomery and the other REL Noteholders were consistent with the documentation Montgomery had received from REL before any controversy arose. REL Docket no. 832 (Noteholders' Committee's proposed solicitation letter); Docket no. 46-2, Montgomery Dec. Ex. 8 (final version of solicitation letter: "In addition, MF08 will release any claims it could otherwise assert against Noteholders that received transfers from REL (other than insiders)").

Finally, it is undisputed that the Ngs controlled MF08, TMF, and REL and had a pattern of treating them as they wished as the MF08 Proof of Claim stated - the *Ngs caused* the $66 million in transfers to be made, either directly or indirectly. Based on this, the court concludes that Montgomery's interpretation of the phrases "REL Transfer" and "paid by REL" is reasonable and the Trustee's is erroneous.

-22-

### 5. "Any Third Party"

Under §4.01 of the Settlement Agreement, MF08 waived the right to pursue any MF08 Potential Avoidance Actions "provided, however, that this agreement shall not limit or restrict the right of MF08 to bring any action against any third party, including any manager, member, insider or professional of MF08." The Trustee argues that this savings clause in §4.01 preserves all claims other than those against REL Noteholders who were "paid by REL."

For several reasons, the Trustee's interpretation of this savings clause is erroneous. First, read literally, the reservation of the right to pursue "any third party" would arguably mean no one was released. That absurd reading is to be avoided. Civil Code §1638.

Second, the undisputed objective of the Settlement Agreement was (1) to resolve the issues regarding the validity and priority of MF08's claim which was based on the alleged fraudulent transfer of $66 million to REL where tracing was problematic and the Ngs' commingling was endemic; (2) to eliminate the REL Noteholders' risk of being sued by both MF08 and REL as the alleged recipients of fraudulent transfers in order to ensure their support for REL's Plan; and (3) to eliminate MF08's ability to impede confirmation because MF08's $66 million claim made it the largest unsecured creditor in REL's case.

Based on the context in which the Settlement Agreement arose, the court declines to adopt the Trustee's interpretation that an avoidance action against "any third party" includes a REL Noteholder who was paid by MF08 or TMF. If there was an intent to carve this group of REL Noteholders out of the release, it had to be precisely stated before the settlement was incorporated into REL's Plan.[18] MF08 acknowledged from the start that the "Ngs caused" every payment by any of these affiliated entities to be

---

[18] The Declaration of James A. Weissenborn in support of confirmation of the REL Plan is consistent with this interpretation. REL Docket no. 943, ¶39-53 (describing the settlements implemented by the REL Plan).

-23-

made in a way that suited their designs and the record shows the Trustee was in possession of records that would have enabled her to trace this transfer before she signed the Settlement Agreement. To pretend otherwise endorses a fiction - that MF08 had legitimate independent management.

The settlement between REL and MF08, with the full participation of the REL Noteholders' Committee, was negotiated in order to "buy peace" with all the stakeholders so REL could reach a consensual confirmation of its Plan. As it was described in the Motion, "the principal parties in interest in the Debtors' chapter 11 cases have reached the Agreement which resolves both *potential disputes regarding MF08's proof of claim ... and* the relative treatment of *all unsecured claims and Noteholder claims* under the Modified Plan." Docket no. 48, RJN Ex. 10 (Motion ¶3) (emphasis added). The Trustee obtained the $5 million "enhancement" and the REL Noteholders agreed to reduce their claims by 50% of what they had been paid on their REL investments pre-petition.[19] The REL Noteholders were led to believe their risk of being sued - by MF08 and REL - as the recipients of allegedly fraudulent transfers was eliminated.

In addition, the drafting of §4.01 is troubling. The words "include" and "including" are not limiting.[20] Because "including" does not place a limit on "any third party" why follow "any third party" with the narrow list of "any manager, member, insider, or

---

[19] Montgomery appears to misunderstand the terms of this 50% reduction. As the Motion explained it, if the plan compromise was approved, the Noteholders' claims "would not be subordinated or challenged, but each Noteholder's claim would be reduced by 50% of any cash received after the Exchange Transaction through the petition date" of REL. In theory, the allowed amount of Montgomery's claim was to be reduced by 50% of the $450,000 he appears to have been repaid.

[20] See American Sur. Co. of N.Y. v. Marotta, 287 U.S. 513 (1933) ("include" is generally used as a word of extension or enlargement rather than one of limitation or enumeration); Fraser v. Bentel, 161 Cal.390 (1911)("includes" is not ordinarily a word of limitation, but rather of enlargement); Bankruptcy Code §102(3) (same).

-24-

professional of MF08"? See In re Coudert Bros., 487 B.R. 375, 390 (S.D.N.Y. 2013) (interpreting employment agreement, "may include" by itself is not a limiting clause but it does not exist in isolation; the following phrase "and whatever other action..." is one of limitation).

There are several contract interpretation tools that support finding that the Trustee's interpretation of "any third party" is erroneous. For example, under the principle *ejusdem generis* (literally, of the same kind), where specific words follow general words in a contract, the general words are construed to embrace only things similar in nature to those enumerated by the specific words. California Farm Bureau Federation v. California Wildlife Conservation Bd., 143 Cal.App.4th 173, 189 (2006) (where specific words follow general words, the general words are construed to embrace only things similar to the enumerated specific words), Nygard, Inc. v. Uusi-Kerttula, 159 Cal.App.4th 1027, 1045 (2008) ("any information" construed in light of the kinds of protected information enumerated in the next sentence). Applying that principle here indicates that the specific class - managers, members, insiders or professionals of MF08 - defines the broad class - third parties. REL Noteholders are not in the class of intended third parties.

The rule of interpretation *noscitur a sociis* (literally, it is known from its associates) suggests that where "any third party" is ambiguous, its meaning may be discerned from the list that follows it, i.e., here it means only third parties who were managers, members, insiders or professionals of MF08. California Farm Bureau Federation, at 189.

The rule of interpretation *expressio unius est exclusio alterius* means the expression of one thing implies the exclusion of the other. Rosenthal-Zuckerman v. Epstein, Becker & Green Long Term Disability Plan, 39 F.Supp.3d 1103, 1107 (C.D.Cal. 2014). Application of this concept suggests that the list following "any third party" illustrates the type of third party - managers, members, insiders or professionals of MF08. REL Noteholders are

-25-

not within this type of third party.[21]

These interpretive rules assist the court in discerning the meaning of "any action against any third party" in §4.01. Based on these rules and the context for the settlement, the court concludes that the Trustee's interpretation of the phrase "any action against any third party, including any manager, member, insider or professional of MF08" is incorrect. As a REL Noteholder, Montgomery is not the type of third party the Trustee may sue.

### 6. Waiver of the Right to Pursue Unknown Claims

Civil Code §1542 provides that a general release does not extend to claims that are unknown or unsuspected at the time the release is executed. Because MF08 waived the protection of Civil Code §1542, the release in the Settlement Agreement *does apply* to claims that were unknown or unsuspected at the time she signed the Settlement Agreement.

The Trustee argues that MF08 waived the protections of Civil Code §1542 only "with respect to the claims released herein" and the "claims released herein" are only the claims against REL Noteholders who were paid by REL. As discussed above, the court finds that this distinction between "paid by REL" and "paid by TMF" does not hold up.

But the Trustee's argument regarding Civil Code §1542 bears further discussion. The Trustee says she possessed all the relevant books and records, but at the time she signed the Settlement Agreement, she was "not aware that funds had been transferred from MF08 to TMF and then used to pay REL Noteholders" because she and her counsel were "focused on maximizing the value of MF08's claim and on the preservation and liquidation of MF08's loan portfolio." Docket no. 54-5, Uecker

---

[21] A release may also be construed most strongly against the party who prepared it. <u>Sime v. Malouf</u>, 95 Cal.App.2d 82 (1949). There is nothing indicating which party prepared the Settlement Agreement. It may have been drafted by REL's counsel or by the Trustee's counsel; counsel to the REL Noteholders Committee may have participated in the drafting.

Case: 13-04190   Doc# 70   Filed: 11/19/15   Entered: 11/19/15 15:09:56   Page 26 of 32

Dec. ¶3, ¶16-17. This is troubling in itself as it was her duty to be fully informed during the settlement negotiations and she possessed the records that allowed her to be fully informed. If she was aware of these transfers but did not disclose them, it gives the appearance that she may not have been fully candid with the other participants in the mediation. At a minimum, prudence would suggest that the waiver of the protections of Civil Code §1542 should have been more carefully considered than it seems to have been, more carefully drafted than it was, or omitted altogether.

The Trustee concedes that there is what she calls a "boilerplate" waiver of Civil Code §1542's protections but contends the §1542 waiver does not operate to release this claim because "there is no language in the release purporting to release unknown claims and Montgomery did not introduce any evidence that the parties' intent was to release unknown claims," and there is "no language in the REL Settlement Agreement releasing claims that the Trustee did not know or suspect to exist" or language by which "the parties took the risk that unknown or unanticipated claims might exist." Docket no. 52, Opposition Memorandum at 7. She insists that what she calls the "mere recital" of the §1542 waiver is not sufficient.

The Trustee is wrong for several reasons. First, the language in the Settlement Agreement is more than a "mere recital" of a Civil Code §1542 waiver. The Settlement Agreement clearly acknowledges that (1) her counsel had given her advice about the significance of waiving §1542, and (2) she was *independently aware* of the significance of waiving its protections for both unknown or unsuspected claims.

Second, in every place she makes this argument about the necessity of "independent language," the Trustee quotes one isolated sentence from Casey v. Proctor, 59 Cal.2d 97, 109 (1963):

> It therefore appears beyond reasonable doubt that Civil Code section 1542 was intended by its drafters to preclude the application of a release to unknown claims in the absence of a showing apart from the words of the release of an intent to include such claims.

-27-

<u>Id</u>. at 109.[22]

In <u>Casey</u>, plaintiff was involved in a car accident and quickly afterwards signed a release covering property damage (for which he was paid) and bodily injuries (for which he was not paid); the release did not include a waiver of Civil Code §1542. When plaintiff later began to suffer injuries stemming from the accident, he sued to recover compensation for these injuries. Defendant moved for and was given a directed verdict based on the release. The directed verdict was reversed on appeal. When the release was signed, neither party had reason to believe personal injuries had been suffered. Plaintiff argued that the release was a general release which, by operation of §1542, did not extend to these unknown injuries. Defendant argued that it was a *specific*, not a general release, because it referred to unknown claims so plaintiff had released the personal injury claim. The court explained that §1542 was not intended to prevent settlements of unknown claims:

> Its purpose was to prevent the mere recital in the release to that effect from barring a claim for injuries later discovered in the absence of a showing of a conscious understanding that if injuries were suffered which had not yet manifested themselves they too would be discharged by the release.

<u>Id</u>. at 109.

<u>Casey</u> is not helpful to the Trustee for several reasons. First, it is a personal injury case, a context with its own set of policy concerns lacking here. <u>Brae Transp. Inc. v. Coopers & Lybrand</u>, 790 F.2d 1439, 1445 (9th Cir. 1986) (declining to apply rationale of personal injury cases to commercial case). Second, as explained in <u>Winet v. Price</u>, 4 Cal.App.4th 1159, 1174, n.7

---

[22] She goes so far as to say there is a "<u>Casey</u> rule." Docket no. 61, Reply Memorandum at 10. As discussed in <u>Winet v. Price</u>, the California Supreme Court's <u>Pacific Gas & Electric</u> decision shows <u>Casey</u> has questionable precedential value. <u>Winet</u>, 4 Cal.App.4th 1159, 1174 n. 7 (1992). The notion that there is a "<u>Casey</u> rule" is a pointless embellishment that comes very close to being a misleading suggestion regarding the current state of the law.

(1992):

> To the extent Casey holds we must ignore the language of the release and examine only extrinsic evidence in evaluating the parties intent, Casey would be inconsistent with the Pacific Gas & E. Co. admonition that the contractual language is the source of the parties' rights and duties, and that extrinsic evidence is examined only to construe any ambiguities extant in the language.

Id. at 1174, n. 7.

Third, the Settlement Agreement *does* indicate a conscious understanding that there may be other claims. The settlement was in significant part predicated on the difficulty and expense of tracing the transfers made by the Ng family members by and among their wholly owned entities. The presence of this tracing issue itself indicates a conscious understanding - apart from the words of the release in §4.01 - that there was a risk that unknown or unsuspected claims might exist.

Finally, the Trustee argues that the §1542 waiver is limited to "the claims released herein" - by which she means the REL Transfers and the MF08 Potential Avoidance Actions but nothing else. She is correct that a §1542 waiver may be limited to specific claims or circumstances. See Butler v. Vons Companies, Inc., 140 Cal.App.4th 943 (2006) (contract ambiguous as to whether employee only released labor grievance claims and not employment discrimination claims so that §1542 waiver may not apply to discrimination claim); Asare v. Hartford Fire Inc. Co., 1 Cal.App.4th 856 (1991) (release of workers compensation claim did not apply to discrimination claim); Integrated Global Concepts, Inc. v. J2 Global, Inc., 2014 WL 1230910 (N.D. Cal. March 21, 2014) (waiver of §1542 was limited by language to specific claims predating the agreement).

The weakness in this argument is that the claim against Montgomery is the same *type of avoidance claim* that the Trustee released - the only difference is that his IRA received $150,000 from a bank account in the name of TMF, MF08's only member and manager. Unlike the distinction in Butler, where the question was about a labor grievance claim and an employment discrimination claim, or the issue in Asare, where the question was about a

-29-

workers compensation claim and an employment discrimination claim, the distinction between an an avoidance action against an REL Noteholder "paid by REL" and one "paid by TMF," ostensibly acting on behalf of REL, is too thin to hold up. See Brae Transportation, Inc. v. Coopers & Lybrand, 790 F.2d 1439 (9th Cir. 1986) (release covered claims regarding net worth, release was general as to this "type of claim").

Most problematic for the Trustee is her misplaced reliance on Winet v. Price, 4 Cal.App.4th 1159 (1992). In Winet, an attorney and his former client entered into an agreement releasing all claims against the attorney including unknown and unsuspected claims, and waiving the benefit of Civil Code §1542. Years later the client sued the attorney. The trial court granted summary judgment for the attorney on the theory that the release covered all claims being asserted by the former client.

The appellate court agreed. First, the unambiguous language of the agreement released all claims, known or unknown. Second, the client's proffered testimony - his uncommunicated subjective intent that he did not intend to release a later discovered claim - was parol evidence that was inadmissible because it contradicted the agreement and the agreement was not reasonably susceptible to the client's interpretation. Third, the circumstances surrounding the adoption of the release suggested that the client did in fact intend to release unknown claims.

The court explained that the client's evidence of his subjective intent was not admissible because it:

> seeks to prove that a release of unknown or unsuspected claims was *not* intended to include unknown or unsuspected claims. If an argument such as this were given currency, a release could never effectively encompass unknown claims. A releasor would simply argue that a release of unknown or unsuspected claims applied only to known or suspected claims, making it ineffective as to unknown or unsuspected claims.

Id. at 1167 (emphasis in original).

This is precisely the problem with the Trustee's argument regarding MF08's waiver of the protections of Civil Code §1542. She admits she possessed all the MF08 and TMF bank records at the

-30-

time she negotiated the Settlement Agreement and then declares she was not aware of the transfer that went from MF08 to TMF to Montgomery. In effect, she says that she did not intend to waive this unknown or unsuspected claim because she did not know of it or suspect she had it. Because she apparently belatedly discovered that she could trace funds from MF08 to TMF to Montgomery, she claims she can escape the fact that she waived the right to pursue unknown claims. In the context of this case, especially where the inability to trace was one of the underlying predicates for the Settlement Agreement, she cannot escape the conclusion that MF08's waiver the protection of Civil Code §1542 prevents her from pursuing recovery from Montgomery.

**IV. Conclusion**

     For the reasons explained above, the court grants summary adjudication in favor of Montgomery. The Settlement Agreement is ambiguous and the extrinsic evidence shows that the release in the Settlement Agreement covers the Trustee's claims in this adversary proceeding. The remaining issues are moot.

**\* \* \* End of Memorandum Decision \* \* \***

-31-

**<u>Court Service List</u>**

Parties by ECF

Richard S. Miller

1600 S. Main Street #230

Walnut Creek, CA 94596

Case: 13-04190   Doc# 70   Filed: 11/19/15   Entered: 11/19/15 15:09:56   Page 32 of 32